**IN THE U.S. DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **DIANNE BUTTS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 1:14-cv-01073 (LMB/TCB)** |
| | ) |
| **PRINCE WILLIAM COUNTY SCHOOL** | ) |
| **BOARD** | ) |
| | ) |
| **Defendants.** | ) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE AND**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, the Prince William County School Board ("PWCS"), submits this Statement

of Material Facts and Supporting Memorandum, with attached declarations and exhibits, in

support of its Motion for Summary Judgment under Fed. R. Civ. P.56.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

I.     **Butts' Employment History With PWCS, 1996-2004**

1.     Butts was hired by PWCS in 1996 via the Troops to Teachers program, a DOD

program that assists military service members to transition to a career as a public school teacher.

Butts, who had a Master's degree in Education and a certification from the Virginia Department

of Education ("VDOE") to teach grades 3 through 6, was assigned to a 5th grade teaching

position at Enterprise Elementary School ("Enterprise") until 1998, when she was reassigned to a

5th grade position at McAuliffe Elementary School ("McAuliffe"). *See* Exs. 1, 2, 4, 6.

2.     Butts obtained continuing contract status starting in the 1999-2000 school year

after serving a three-year probationary period, as mandated by §22.1-303 of the Virginia Code.

*See* Ex. 4. As such, Butts could only be dismissed for cause, as specified in her continuing

contract and Va. Code §22.1-307. *Id.*

3. Although Butts obtained overall "Effective" ratings at Enterprise and McAuliffe, some of her evaluations reflected areas of concern, including maintaining a "favorable psychological environment" for students. *See* Ex. 3.

## II.    Butts' Military Leave of Absence, Resignation, and Reemployment by PWCS

4. Butts, who was a member of the U.S. Army Reserve, requested and received a military leave of absence from PWCS in the fall of 2004 in connection with her receipt of orders for active duty service. Butts' leave was subsequently extended on several occasions until March of 2007, when Butts returned a notice of intent form reflecting her resignation from PWCS, which was accepted by Dr. Michael Mondak, Supervisor for Elementary and Special Education Personnel in the PWCS Department of Human Resources ("HR"). *See* Exs. 6-9, 113at 145-146.

5. Following a deployment to Kuwait, Butts returned to the United States on May 8, 2008, but asked the Army to stay on active duty status in order to maximize her retirement benefits. After the Army refused that request on August 15, 2008, Butts was hospitalized and sought treatment at DeWitt Army Community Hospital, where she was "**extremely depressed, crying . . . throughout [the] encounter**" and feeling "**angry and anxious about the transition**" to civilian employment. Exs. 108, 114 at 291-294, 298-307. On September 4, 2008, Dr. Peppard, an Army psychologist, diagnosed Butts as suffering from adjustment disorder with depressed mood, which symptoms Butts attributed to four suicides she was exposed to overseas and as "directly related to having to find another job and dissolution of her plan to stay active duty." Exs. 108, 114 at 305-307.

6. In June of 2008, Butts visited Mondak to inquire into reemployment with PWCS. Exs. 6, 113 at 146-152. At the time, Mondak understood Butts' status to be retired and did not realize she intended to seek reemployment under USERRA. Therefore, he advised Butts to reapply through PWCS' new online application system when she was ready to return, and to

submit her application directly to any preferred schools, so as to increase her chances of being assigned to a location she desired. *See* Ex. 6; Ex. 113 at 149.

7.     Butts, whose active duty service was extended from September 6, 2008 to November 8, 2008 to allow her more time to transition to civil life, did not seek reemployment with PWCS upon her discharge, but took 90 days "rest and recuperation," applied for employment elsewhere, and did not notify HR when she would be ready to return to PWCS. Exs. 6, 113 at 150-155, 114 at 308-309.

8.     Nor did Butts alert Mondak or any other HR administrator when she first submitted an online application for reemployment on January 21, 2009, seeking reemployment as a principal or assistant principal. (Butts did not possess the administrative qualifications or certification for either position.) Exs.6, 11. Butts also submitted additional online applications for substitute teaching and a position at Fannie Fitzgerald Elementary School ("Fitzgerald"). *Id.* However, she did not complete her application submissions until late February of 2009, when she submitted her tuberculosis testing results and reference information. Ex. 16.

9.     Since neither Mondak nor Amy White, PWCS' Director of Human Resources, were aware that Butts had filed online applications or that she was seeking reemployment under USERRA, the PWCS Office of Substitutes and Temporary Employment initially approved Butts' reemployment as a long-term 5th grade substitute at Fitzgerald starting on or about February 26, 2009. Exs. 6, 13, Butts did not obtain this position through HR, but applied directly to the principal, De'Rain Irvin (f/k/a De'Rain Simpson), following up on a referral from a friend. *Id.*; Ex. 12; Ex. 113 at 162-164. Irvin had initially intended to recommend that Butts be assigned to Fitzgerald for the remainder of the 2008-2009 school year and the subsequent school year. Ex. 12. However, Butts worked at Fitzgerald less than one week. *Id.* Butts undermined Irvin by telling other teachers on the 5th grade team that Irvin did not know what she was doing and that

the teachers did not have to listen to her. Butts also spoke to the students in a disrespectful or harsh manner and refused to teach pursuant to PWCS lesson guides or established practices, leading to confusion among students assigned to her class. She also took leave without following school policy. *Id.* When Irvin spoke with Butts about these concerns, Butts was unapologetic and said she had just gotten orders for reserve duty (which she cancelled), only returning to Fitzgerald to pick up her things. *Id.;* Ex. 113 at 166-177. As a result of Butts' behaviors, Irvin contacted HR and asked that Butts not be offered any further assignments at Fitzgerald. Exs. 12-14. On March 11, 2009, it was also reported to White that Butts had not cooperated with the reemployment process by initially refusing to be fingerprinted for an updated background check and refusing to attend mandatory orientation and training. Exs. 13, 14.

10.     Based on that information and Irvin's request, on March 11, 2009, White's office (still unaware that Butts was seeking reemployment under USERRA) sent Butts a letter declining to move forward with an offer of employment at Fitzgerald. *Id.* Butts tried unsuccessfully to call HR after the Fitzgerald position did not work out, but not until well after she had received White's letter. Ex. 113 at 179-180.

11.     Following her conflict with Irvin, Butts contacted Alicia Queen, an ombudsman with the DOD's Employer Support of the Guard and Reserve ("ESGR"), to seek assistance in obtaining reemployment with PWCS. Ex. 113 at 179-183. Upon Queen's advice, on March 27, 2009, Butts sent the PWCS Division Superintendent a letter titled, "Active Duty Return Notification Letter to Employer." *Id.*; Ex.16. In the letter, which clarified that she was seeking reemployment under USERRA, Butts admitted to criticizing the manner in which Irvin had staffed her class at Fitzgerald. Ex. 16. Upon learning that Butts was seeking reemployment under USERRA, White responded to Butts the same day to request that she provide a copy of her discharge orders so she could be processed as an employee returning from military service. Exs.

13, 17.

12.     On April 2, 2009, Queen contacted White and advised that Butts had filed a complaint with ESGR in connection with her right to reemployment with PWCS. Exs. 13, 18. Thereafter, White, and then Mondak, worked collaboratively with Queen to clarify any misunderstanding concerning Butts' status, and ensure she was promptly reemployed as a continuing contract teacher, in accordance with USERRA. Exs. 6, 13, 18.

### III.     Butts' 2008-2009 Reemployment As A Continuing Contract Teacher Assigned to Sinclair Elementary School

13.     Because Butts was out of town, PWCS was unable to meet with her for nearly two weeks in order to resolve her situation, but shortly thereafter identified a 5th grade resource teaching position at Sinclair Elementary School ("Sinclair"), where Butts agreed to start work on April 27, 2009. Exs. 6, 13, 18. Butts was reinstated as a continuing contract teacher and issued a notice of assignment to Sinclair, with the same salary and benefits to which she would have been entitled had she never resigned or been absent on military leave from 2004 to 2008. Ex. 6, 13, 19. PWCS then issued a second notice of assignment retroactive to August 2008 through the end of the school year, and paid Butts a salary for the entire 2008-2009 school year, although she was not even discharged from the military until November 8, 2008 and did not submit an application for reemployment until January of 2009. Exs. 6, 13, 20. In addition, PWCS gave Butts credit for all leave she had accrued at the time she resigned in 2007 (114.93 hours or 16.41 days), although PWCS did not provide this benefit to other employees, and 46 months of retirement service at no cost to her. Ex. 23.

14.     At Sinclair, Butts was assigned to provide pull-out math instruction to remedial students. Ex. 25. The principal of Sinclair, Donna Fagerholm, and the other 5th grade teachers welcomed Butts to their team and met with her to discuss the students' instructional needs, lesson plans, and other preparation for the end-of-year Standards of Learning ("SOL") exams.

Fagerholm, a military wife for more than 26 years, did not know that Butts had filed a complaint with ESGR. *Id.*

15.     Butts was provided a room in which to provide instruction, which, although smaller than the other classrooms, had been used for years (and continues to be used) by the 5th grade team and the ESOL teacher to provide instruction, due to its proximity to the other 5th grade classrooms and space restrictions from overcrowding. *Id.*

16.     However, Butts began to exhibit some of the same behaviors seen at Fitzgerald, refusing to follow the instructional guides, lesson plans, or PWCS curriculum, and insisting on teaching students using her own methods. Butts' methodologies were ineffective and sometimes incorrect. Students often returned to their base classrooms more confused, resulting in further regression in their learning. *Id.* As these students were preparing to transition to 6th grade, and were quickly approaching end-of-school-year testing, Fagerholm became increasingly concerned about Butts' resource instruction and reassigned her to perform other duties, such as testing (which all teachers were assigned to perform) . *Id.*

17.     In response to Butts' request for a new classroom, Fagerholm also moved her to a modular classroom. Many teachers had been reassigned to modular classrooms, as the school had long run out of traditional classroom space within the building. *Id.*

**IV.     Butts' 2009-2010 Reassignments to Dumfries and Montclair Elementary Schools**

18.     Butts completed the 2008-2009 school year at Sinclair. Due to Butts' performance concerns, Fagerholm requested that she not be reassigned to Sinclair for the 2009-2010 school year. *Id.* Thereafter, Mondak worked with Butts throughout May and June to assign her to a different location for the following school year. Ex. 6. Mondak first identified a 5th grade position at Dumfries Elementary School ("Dumfries"), which PWCS expected to become available due to a pending teacher resignation. *Id.* Butts interviewed for and accepted the

position. However, the resigning teacher then rescinded her resignation, therefore eliminating the intended vacancy. In early June of 2009, the Dumfries principal and Mondak notified Butts of this change. *Id.* Ex.113 at 199-201; *see also* Exs. 26-27.

19. In light of Butts' certification to teach grades 3 through 6, the similarities in 4th and 5th grade instruction, and the lack of any available 5th grade positions for the 2009-2010 school year, Mondak then reassigned Butts to an open 4th grade position at Montclair Elementary School ("Montclair"). Ex. 6. Mondak advised Butts and the principal of Montclair, Tawnya Soltis, regarding this assignment, and Butts was issued a notice of assignment under her continuing contract. *Id.*; Ex. 30.

20. Soltis immediately contacted Butts to invite her to available training opportunities at Montclair. Ex. 31. Butts, who had not returned Soltis' telephone calls and was unhappy over the reassignment, sent Mondak a letter on July 2, 2009, complaining that she preferred Dumfries, "an African American school," and demanding a 5th grade position. Ex. 28. Mondak responded on July 15, 2009, assuring Butts that her reassignment was appropriate under USERRA and that she would receive any necessary training. He also implored Butts to return Soltis' calls. Ex.29. Butts did report to teacher orientation at Montclair during the last week of August 2009. Ex. 31.

## V. **Butts' 2009-2010 and 2010-2011 Employment at Montclair**

21. Early in the 2009-2010 school year, during informal observations, Montclair's administrators noticed deficiencies in Butts' performance inconsistent with the performance standards under which Virginia teachers are evaluated. Exs. 31, 32. On October 14, 2009, Montclair's Assistant Principal, Kathryn Forgas, and Butts developed an action plan designed to assist Butts in correcting those performance deficiencies. *Id.* Exs. 34-36. Soltis also assigned Butts to a mentor and solicited the assistance of professional development staff and other instructional resources, including, *inter alia*, a professional development specialist, math

specialist, and others. Exs. 31, 32, 52-59. Butts was not receptive to working with these individuals, and consistently attempted to avoid meeting with them. *Id.*

22.     Butts, who did not meet all of her action plan objectives by the start of the second quarter of the school year, received "Needs Improvement" ratings on her Mid-Year Report, which, along with Soltis' memo, informed her that improvement was needed or discharge was possible. Exs. 31-34, 39-46. On January 8, 2010, Forgas and Butts updated the action plan. Exs. 31, 32, 40. Butts continued to resist the action plan requirements, displaying indignation because she was "a tenured teacher," describing her resource teacher as "condescending," and refusing to observe other teachers because "she had seen all she needed to see." Exs. 31, 32, 35, 38-40; 113 at 207-208. Butts received another unsatisfactory evaluation in April of 2010. Ex. 44.

23.     In light of Butts' continued resistance to the action plan requirements, failure to meet performance standards, and the receipt of multiple parental complaints concerning the quality of instruction and Butts' treatment of students assigned to her classroom, Soltis recommended Butts for dismissal on May 11, 2010. Exs. 31, 45. Thereafter, on May 19, 2010, the Associate Superintendent for Central Elementary Schools, Todd Erickson, personally observed one of Butts' classes. He later met with Butts to review his observation notes, which also reflected Butts' lack of planning, organization, and general unpreparedness for class that day. Exs. 46, 47.

24.     On June 17, 2010, Erickson informed Butts that although he was "in total support of Ms. Soltis' concerns regarding [Butts'] professional performance[,] rather than support [the recommendation of] dismissal at this time, [Erickson would] provide [Butts] with the opportunity to address the concerns in [her] action plan for the first quarter of next year." Exs. 46, 48. Butts was issued another Notice of Assignment of Continuing Contract, assigning her to Montclair for the 2010-11 school year. Ex. 48.

25.     Despite Erickson's letter, on July 12, 2010, Butts filed a complaint with the Department of Labor ("DOL"), alleging that PWCS had failed to appropriately reinstate her and was discriminating against her on account of her military veteran status ("the First DOL Complaint"), and represented to the agency that she was "being forced to resign and is undergoing wrongful termination proceedings."Ex. 50. After PWCS responded to the First DOL Complaint, it received notice on September 13, 2010 that the DOL was closed its file, without a finding that PWCS had violated USERRA. Ex. 51.

26.     On August 30, 2010, following her return from a trip to Europe (Ex. 60), Butts and Forgas developed a Professional Improvement Plan ("PIP") to address the ongoing concerns with Butts' work performance. Ex. 61. During the beginning of the 2010-2011 school year, Montclair continued to receive parental complaints regarding Butts' treatment of their children, and Butts continued to display other behaviors and conduct that failed to meet performance standards. Exs. 31, 32, 63.

## VI.     Butts' Long-Term Sick Leave

27.     On October 10, 2010, Soltis received a request from Butts to take long-term sick leave until February 1, 2011, accompanied by a doctor's note, "to help her recover from stress[,]" as she had "been experiencing a lot of anxiety, depressed mood, and intrusive thoughts of her time serving in the military." Exs. 31, 65. According to Butts, **"[t]his condition started approximately July 2008 upon completion of two deployments**," but "did not come to light until April 2009." *Id.*

28.     Upon receipt of Butts' request, Soltis met with her to transition a long-term substitute to take over Butts' class and to ensure that lesson plans and student progress reports were complete. Ex. 31. "For that purpose and in the interests of my students," Butts then agreed to stay at Montclair through October 27, 2010, with the understanding that she could continue to

take leave for specific doctor's appointments and any other occasion she needed it. Butts confirmed this agreement in a letter to White, in which she hoped "this delay w[ould] not defeat the purpose for getting treatment **for a condition that has been ongoing for several years gone [*sic*] undetected**." *Id.,*Ex. 66-68. Butts went on long-term sick leave, effective October 27, 2010, and never returned to work. Exs. 23-31, 69-72, 74-77.

29.     Butts remained on paid sick leave until May of 2011, when she transitioned to FMLA leave, repeatedly extending her leave based on certifications from her psychiatrist that she was unable to work. Exs. 23, 31, 68, 72, 75.

30.     On April 28, 2011, Soltis again recommended Butts' dismissal. Ex. 31. Erickson accepted the recommendation, and on May 9, 2011, Butts was given notice of his recommendation and that of the Division Superintendent, as well as the process by which to grieve the proposed dismissal. Exs. 31, 46, 78-80. PWCS Regulation 508.01-1, which aligns with the State grievance procedure, provided Butts with fifteen days to request a hearing before PWCS or a fact-finding panel, which she failed to do. Exs. 23, 31, 79. On June 15, 2011, PWCS voted to terminate Butts' continuing contract. Exs. 31, 46.

31.     Butts did belatedly submit a grievance, attempting to grieve her proposed dismissal and entitlement to join PWCS' Sick Leave Bank. Exs. 81-84. Although the grievance was denied as time-barred and Butts did not meet the requirements to participate in the Sick Leave Bank, White, Soltis, and PWCS' Director of Benefits and Retirement Services, Deborah Sparks, met with Butts to address her concerns. Exs. 13, 23.When Butts claimed financial hardship, White and Sparks obtained permission to offer her $15,089.42, the value of 44 days of the sick leave she sought and three additional months of health insurance, which Butts rejected. *Id.*

32.     Butts never advised PWCS that she suffered from post-traumatic stress disorder

("PTSD") until she attached a note to her grievance, signed by her social worker, indicating she was permanently disabled from PTSD and unlikely to be able to return to work for a minimum of two years. Exs. 13, 31, 81.

**VII.  Butts's History of PTSD and Applications for Disability**

33.  Butts has been deemed disabled and unable to work by the Social Security Administration ("SSA") since October 28, 2010, and by the Veterans Administration ("the VA") since June 30, 2011. Exs. 85, 87, 92.

34.  Butts' applications to the VA, Virginia Retirement System ("VRS"), SSA and supporting medical records are rife with admissions that she **could not work after October 28, 2010** because she suffered from PTSD and multiple other disabilities (including depression and anxiety); **that the PTSD and other disabilities are service-related**; and that her performance problems as a teacher **were due to the symptoms** of those disabilities.  Exs. 86, 89, 91, 93, 95, 97, 99, 100, 105, 106, 108, 109.

35.  For example:

a.  On November 30, 2010, Butts certified to the VA that from July 8, 2006 to January 7, 2007, she developed PTSD and related conditions as a result of, *inter alia*, "DAILY EXPOSURE TO EXPOSURE [*sic*] AND WATCHING TRAUMATIC EVENTS, I.E. [*sic*] NATURAL DISASTERS AND TERRORIST ATTACKS";  including, *inter alia*, exposure to soldier suicides and damaged vehicles related to attacks and deaths in Iraq and Afghanistan; rebuking a soldier later killed in combat; and providing logistical support following Hurricanes Katrina and Rita. Butts certified that, **"the traumatic events that I believe lead [*sic*] up to post-traumatic stress disorder have been so overwhelming and frightening that they started to affect my employment and the maintenance thereof."** Ex. 91 (emphasis added). "When the kids would touch me on my shoulder, I would jump and scream, then asking [*sic*] them to please

do not touch me from behind, I don't know what I might do." *Id.* "Whenever possible I avoid or refuse to go anywhere on the base like for commissary or anything that has to do with my civilian job, i.e., school boards on TV, school buildings. **There were times I felt like I out blow [*sic*] the building up saying, 'I hate this, I hate this, what did I do to deserve this.'"** Ex. 111. (emphasis added). *See also* Ex. 110.

       b.       After the VA granted her a 50% disability rating predicated on PTSD (in addition to multiple ratings for other disabilities) (Ex. 94), Butts appealed that decision on July 28, 2011, stating:

> "I disagree with the 50% service connection rating for post-traumatic stress disorder (PTSD). Instead, a higher evaluation of 70% is warranted because there are deficiencies in most areas such as work, family relationships, and judgment due to the symptoms of continuous panic/anxiety attacks and prolonged depression over a period of years.
>
> **The depression and sleep apnea interfere with logical thinking and sleep deprivation that has led to job termination. . . . Weekly panic attacks, episodes of depression, and inability to maintain gainful employment (job dismissal June 15, 2011) and periodic hygiene concerns have contributed to my inability to work and maintain gainful employment."**

Ex. 95 (emphasis added); *see also* Ex. 97.

       c.       In an April 4, 2013 statement to the VA seeking an increase in her PTSD rating, Butts certified that her depression, anxiety, and stress were also due to: her diagnoses as a borderline diabetic with irritable bowel syndrome that **"limits my functional capacity and prevents me from being gainfully employed"**; guilt over leaving her daughter; restless leg syndrome; dental trauma; violence where she struck a fellow comrade; and a domestic dispute in 2011, when she assaulted her daughter and was arrested. Ex. 99 (emphasis added). Butts certified that "[i]n November 2012, I was considered disabled and cannot go to work under the provisions of SSD effective October 28, 2010 **because of military trauma**." *Id.* (emphasis added). *See also* Ex. 100.

       d.       Butts also applied for and received disability from the SSA for *inter alia,*

depression, anxiety disorder, and PTSD, as a "military casualty case." Ex. 87.

**ARGUMENT**

In her Third Amended Complaint, Butts asserts only two counts against the School Board- failure to reemploy in violation of §§ 4313(a)(3) and (a)(4) and wrongful termination in violation of § 4316(c) of USERRA (Count I), and disability discrimination under the ADA (Count II) Third Amend. Compl. ¶¶ 123-151. Notably, Butts has withdrawn her discrimination and reprisal claims under §4311 of USERRA. *Id.*¶ 133.

**I.     Summary Judgment Is Appropriate Under Count I - USERRA**

    **A.     The Reemployment Claims**

        **1.     Butts' §§ 4312 And 4313 Claims Are Limited To Her Initial Placement At Sinclair.**

The Fourth Circuit has clarified that USERRA contains three separate protections for returning members of the military. *Francis v. Booz. Allen & Hamilton, Inc.*, 452 F. 3d 299, 303-306, (4th Cir. 2006). 38 U.S.C. §4312 entitles a returning service member to immediate reemployment in a position for which he or she is qualified as prescribed in §4313 (the reemployment provisions). §4311 (the discrimination or "catch-all" provision) prohibits an employer from denying such individuals certain benefits of employment on the basis of their membership in the armed services. Finally, §4316 (the dismissal provision) protects such employees from dismissal without just cause for a period of time after reemployment. *Id.* at 304.

This distinction is of particular importance here, where Butts alleges that various aspects of her employment occurring well after her initial reemployment at Sinclair in April of 2009 are a violation of USERRA's reemployment provisions, because the Fourth Circuit has specifically held that,

> "the 'reemployment' rights protected by §§4312 and 4313 apply only at the instant of reemployment, and [] other sections of USERRA operate to protect employees after they are properly reemployed under §§4312 and 4313. . . Put more simply, §4312 only entitles a service person to immediate reemployment

and does not prevent the employer from terminating him the next day or even later the same day. The apparent harshness of this result is addressed by the fact that §§4311 and 4316 operate to protect the employee as soon as she is reemployed."

*Id.* at 304 (quoting *Jordan v. Air Prods. & Chems., Inc.*, 225 F. Supp. 2d 1206, 1208

(C.D. Cal. 2002)).

In *Francis*, the Fourth Circuit found that changes to the employee's work duties and schedule, which occurred after she was initially returned to employment with the same benefits she enjoyed prior to her military leave, could only be challenged under the nondiscrimination protections of § 4311, which are procedurally distinct from the reemployment provisions of §§ 4312 and 4313. "An employee proceeding under §4311 has the burden of proving that the employer discriminated against him or her based on a status or activity protected by USERRA. . . . . Section 4312 imposes no such burden." *Id*. at 303 (citing 20 C.F.R. §§1002.22, 1002.33 (2006)). Unlike Butts, Francis had asserted a §4311 discrimination claim under which to challenge the subsequent changes to her employment.

The Fourth Circuit's holding in *Francis* has been followed in multiple jurisdictions. *See, e.g.*, *Clegg v. Ark. Dep't of Corr.*, 496 F. 3d 922, 930 (8th Cir. 2007) (analyzing employee's claims that her duties were altered, she was given a negative evaluation, and not provided with tools needed to perform her job under § 4311, after finding that employee had been properly reinstated at the same grade and rate of pay under § 4312); (*Bennett v. Dallas Ind. Sch. Dist.*, 936 F. Supp. 2d 767, 786 (N.D. Tex. 2013) (limiting §§ 4312 and 4313 reemployment claims of a disabled service member to his initial placement as a security officer, and not to his subsequent reassignment to a dispatch position); *Reed v. City of Charleston*, No. 2:11-cv-00493, 2012 U.S. Dist. LEXIS 72802, at *13-14 (D.S.C. May 25, 2012); *Lisdahl v. Mayo Found. For Med. Educ.*, 698 F. Supp. 2d 1081, 1104 (D. Minn. 2010).

*Bennett is* particularly apposite to this case. Like Butts, Bennett claimed to be disabled

14

due to PTSD and other service-related injuries. He also argued that under subsections 4313(a)(3) and (a)(4) of USERRA, his employer, a school district, was required to take reasonable efforts to qualify him for placement in additional positions beyond his initial reemployment position, and that the school district did not exert reasonable efforts to make him qualified for those positions. The Court rejected that argument, noting that, "[t]he reemployment requirements of §§ 4312 and 4313 apply only to the initial rehiring, not subsequent reassignments. . . . Therefore, Bennett's reemployment claim is limited to DISD's placement of him in the [initial] security position." 936 F. Supp. 2d at 786 (citing *Francis*, 452 F 3d at 304).

Accordingly, although Ms. Butts alleges that her July 2009 reassignment to Montclair as a 4th grade teacher, her subsequent evaluations, her placement on an action plan, and her termination are a violation of USERRA's reemployment provisions, those claims are outside the scope of 38 U.S.C. §§ 4312 and 4313.

### 2. Butts Was Rehired In The Same Position She Held Prior To Separation, Or Alternatively, In A Position Of Like Seniority, Status And Pay.

There is no dispute in the material facts relating to Ms. Butts' application for reemployment and initial reemployment as a 5th grade teacher at Sinclair in April of 2009.

Under USERRA's reemployment protections, **upon application** to an employer within 90 days of discharge from service, returning military personnel who, like Ms. Butts, have served for over 90 days, are entitled to reemployment "in the position of employment in which the person would have been employed if the continuous employment of the person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform." 38 U.S.C. §4313 (a)(2)(A). Such a position is commonly referred to as the "escalator position." The returning employee is also entitled to the same "employment benefits" upon rehiring, which USERRA defines as follows:

*"the terms, conditions, or privileges of employment, including any advantage,*

*profit, privilege, gain status, account or interest (including wages or salary for work performed)* **that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice** *and includes rights and benefits under a pension plan, a health plan, and employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or locations."*

38 U.S.C. §4303(20) (emphasis added).

In order to trigger reemployment rights under USERRA, a returning service member, must, *inter alia*, "report to, or submit an application for reemployment to, such employer." 38 U.S.C. §4312 (a)(3). "The statute does not further define what it means to submit an application for reemployment. However, cases under the VRRA have elaborated on this term. "An application for reemployment 'involves more than a mere inquiry.'" *McGuire v. UPS*, 152 F. 3d 673, 676 (7th Cir. 1998) (citations omitted). Whether an employee has reported to an employer or submitted an application for employment, "a case-by case determination" is appropriate, which focuses on "the intent and ***reasonable expectations of both the former employee and employer, in light of all the circumstances[,]***" and "[r]easonable notice to a large corporation 'in light of all the circumstances,' . . . is quite a different thing from reasonable notice to a small employer." *Id.* At 676-77 (citing *Shadle v. Superwood Corp*., 858 F. 2d 437, 439 (8th Cir. 1988) (emphasis added) (additional citations omitted).

Under the circumstances of this case, where PWCS employed over 10,000 employees and its online application system was not designed to ferret out those applicants who might be returning from military service and seeking reemployment under USERRA, it was not reasonable to expect PWCS to immediately employ Butts upon the submission of her online applications at the end of January of 2009, because she did not communicate her status as a returning veteran or expectations under USERRA directly to an appropriate person in HR until her March 27, 2010 letter.

Although Butts met briefly with Mondak seven months earlier, in June of 2008, to advise him that she expected to return to work in the event she was discharged from active duty, Mondak believed that because Butts had resigned from PWCS during her military leave, she needed to follow the usual online procedure to identify and apply for desirable vacancies within PWCS when she was ready to return. At that time, Butts also anticipated staying on active duty for at least another year (as evidenced by her hospitalization and diagnosis of depression in August of 2008, attributable to her impending military discharge). Even after her discharge from active duty in November of 2008, Butts took 90 days "rest and recuperation," looked for employment elsewhere, and never notified Mondak, White or any other HR administrator when she was actually ready to return to PWCS or when she filed her online applications at the end of January, 2009. Instead, Butts pursued her own leads, following up on a referral from a friend for the 5th grade position at Fitzgerald. Only after Butts got into the disagreement with Fitzgerald's principal did she contact the ESGR ombudsman (Queen) and, at her suggestion, send the March 27, 2009 letter to the Division Superintendent asking for reemployment under USERRA.

 Once White received Butts' letter, she responded the same day seeking the discharge documentation USERRA requires (*see* 20 C.F.R. §1002.21), and she and Mondak worked in continuous collaboration with Queen during April 2009 to locate an available position that met Butts' qualifications to teach grades 3 through 6. Butts' unavailability to meet with Mondak for two weeks delayed her actual placement at Sinclair until April 27, 2009.

Although Butts was available as early as November 8, 2008, she did not reapply to PWCS until well into the second half of the school year, when most teaching vacancies were already filled and it would have been extremely detrimental to the educational continuity of students to replace a sitting 5th grade classroom teacher with a newcomer unfamiliar with the students and their progress through the curriculum, especially as students were gearing up for

SOL examinations. Butts' placement at Sinclair as a 5th grade resource teacher in April of 2009 was an available position for which she was qualified and certificated, and that met PWCS' needs. Ex. 6. "An employer is permitted to take into consideration changes in the workplace during an employee's military leave. The USERRA regulations recognize that an employer's reemployment offer may be affected by changes in staffing or work priorities, so long as the returning employee maintains the seniority and job classification he would have held if he had been employed during his period of military service." *See* 28 C.F.R. §1002.194 ('The reemployment position may involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement, depending upon application of the escalator principle.')" *Fannin v. U. S. Space Alliance,* LLC, No. 6:07-cv-1315, 2009 U.S. Dist. LEXIS 6468, at *19 (Jan. 20, 2009); *Woodward v. N.Y. Health & Hosps. Corp.*, 554 F. Supp. 2d 329, 355 (E.D.N.Y. 2008). Butts' placement at Sinclair was based solely on PWCS' legitimate pedagogical and staffing needs.

Butts was clearly qualified for the 5th grade position at Sinclair. At the time Butts left PWCS in 2004, she was a continuing contract teacher, certificated by the Commonwealth of Virginia to teach grades 3-6, who held a Master's degree in Education and had eight years of teaching experience with PWCS, as well as generally "effective" performance evaluations. USERRA defines "qualified" as "having the ability to perform the essential tasks of the position." 38 U.S.C.A. §4303 (9). The essential functions of a PWCS elementary school teacher were the same for all grades, and for all classroom and resource teachers, as reflected on the job description attached as Ex. 10; *See also* Exs. 6, 31, 33.

Upon assignment to Sinclair, Butts was returned to her continuing contract as a 5th grade teacher for the entire 2008-2009 school year, and received the salary and benefits to which she was entitled in that escalator position. In addition, PWCS **overcompensated** Ms. Butts by

making the contract effective August 20, 2008 through June 30, 2009, paying her for the entire 2008-2009 school year and crediting her with additional sick leave, despite her March 2007 resignation and the fact that she was not even eligible for reemployment until after she was discharged on November 8, 2008.

The Third Amended Complaint glosses over Butts' placement at Sinclair as "a provisional and temporary position." That characterization is belied by the material undisputed facts and the law governing the employment of continuing contract teachers in Virginia. While Butts was only **assigned** to Sinclair for the remainder of the 2008-2009 school year, she was reinstated with full salary and benefits under her continuing contract, which entitled her to a teaching position for subsequent years, absent just cause for her dismissal.

Continuing contract teachers (*i.e.*, those employed continuously for more than three years) are entitled to a contract for each subsequent school year "during good behavior and competent service." Va. Code § 22.1-304(B). Prior to July 1, 2012, a continuing contract teacher was automatically entitled to a contract for the following school year unless he or she had received written notice of noncontinuation of the contract by April 15[1] of the current school year. Butts received no such notice, but remained on a continuing contract until her termination in June of 2011.

### 3. Butts Was Not Entitled To A Specific Assignment Or Location Of Her Choice.

Any argument that Butts was entitled to a particular grade assignment, duties or school under USERRA is simply wrong. USERRA requires only that an employee returning from military service cannot be lawfully deprived of a "benefit of employment" (including the right to a specific location or job duties) if that benefit "**accrues by reason of an employment contract**

---

[1] Va. Code §22.1-304 (B) was amended in 2012 to change the notice date from April 15 to June 15.

**or agreement or an employer policy, plan or practice."** 38 U.S.C. §4303(2). (emphasis

added). By law, policy, and contract, PWCS teachers are not entitled to choose their schools,

grade levels, duties, or other assignments. Therefore, such a placement was not a benefit to

which Butts was entitled under USERRA.

Va. Code § 22.1-295(A) provides, in pertinent part, that, "the teachers in the public

schools of a school division shall be employed and placed in appropriate schools by the school

board upon recommendation of the division superintendent. In placing teachers, school boards

shall fill positions with licensed instructional personnel qualified in the relevant subject areas."

Similarly, Va. Code §22.1-297 states that,

> "[a] division superintendent shall have authority to assign to their respective
> positions in the school wherein they have been placed by the school board all teachers,
> principals and assistant principals. If the school board adopts a resolution authorizing
> the division superintendent to reassign such teachers, principals, and assistant
> principals, the division superintendent may reassign any such teacher, principal or
> assistant principal for that school year to any school within such division, provided no
> change or reassignment during a school year shall affect the salary of such teacher,
> principal, or assistant principal for that school year."

At Policy 511, PWCS adopted such a resolution. Ex. ____.In addition, Butts' contracts of

employment contained the same language as the statute, allowing PWCS, through the

Superintendent, to assign her to whatever grade or duties she was licensed to perform, and in

whatever location she was needed. Ex. 4 ¶ 6.

USERRA also does not require an employer to provide a benefit (*e.g.*, the right to select a

grade level or school assignment) to employees returning from military leave that is not

generally provided to other employees, but only to treat them equally with employees who return

to work after a non-military leave. *Crews v. City of Mt. Vernon*, No. 06-1012, 2008 U.S. Dist.

LEXIS 41710, at *11- 16 (S.D. Ill. May 27, 2008), (citing *Monroe v. Standard Oil Co.*, 452 U.S.

549, 561 (1981)).

## 4. Butts Has No Standing To Assert Claims Under §§4312 And 4313

**Because She Has No Available Remedy And Her Claim Is Moot.**

Butts' reemployment claims are moot since they are limited to her immediate reemployment, for which she has no remedy and, therefore, no standing.

USERRA provides only three remedies for a violation of its provisions:

*(A)The court may require the employer to comply with the provisions of this chapter.*
*(B) The court may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions of this chapter.*
*(C) The court may require the employer to pay the person an amount equal to the amount referred to in subparagraph (B) as liquidated damages, if the court determines that the employer's failure to comply with the provisions of this chapter was willful.*

38 U.S.C.A. §4323 (d).

It is undisputed that following her reemployment with PWCS as a teacher in the spring of 2009, Butts was fully compensated, even overcompensated, for all wages and benefits to which she might arguably have been entitled for the 2008-2009 school year. In addition, because Butts is no longer employed with PWCS, and is incapable of holding any type of employment, having been declared disabled by her physicians, the VA, the SSA and VRS, an injunction directing PWCS to reemploy her would be futile.

The Eleventh Circuit addressed this very issue in *Dees v. Hyundai Motor Mfg. Alabama*, affirming summary judgment in favor of Hyundai on the plaintiff's USERRA claims. The district court had dismissed the plaintiff's harassment claim for lack of standing and mootness, holding as follows:

"*Because Dees suffered no loss of wages or other benefits as a result of the alleged harassment against him, he would not be entitled to loss of wages or other benefits or any commensurate liquidated damages were he to prevail on his harassment claim. And because he is longer working for HMMA, an injunction requiring HMMA and MHA 'to comply with the provisions of [USERRA], 38 U.S.C.A. 4343 (d) (1) (A), would be of no benefit to him. In short there is no relief the court can give Dees for the harassment he may have suffered.*

*As a result, Dees does not meet the minimum constitutional requirements for standing as to his harassment claim.*"

605 F. Supp. 2d 1220, 1229 (M.D. Ala. 2009), *aff'd*, 368 Fed. Appx. 49 (11th Cir. 2010).

The district court noted that under the standing doctrine articulated by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), a plaintiff must have (1) "suffered . . . an invasion of a legally protected interest resulting in a concrete and particularized injury, (2) the injury must have been caused by the defendants' complained-of actions, and (3), **the plaintiff's injury or threat of injury must likely be redressible by a favorable court decision.**" *Id.* (emphasis added) (internal quotations omitted). *See also Woodward*, 554 F. Supp. 2d at 354 (holding that employee's claim that she was deprived of a raise in violation of her right to reemployment was moot because she had received a retroactive raise after her return to employment and had no injury in fact that could be remedied under USERRA).

For the reasons argued above in Section I (A)(2), even if the Court were to find that PWCS violated USERRA's reemployment provisions, there is no evidence that such violation was willful, justifying liquidated damages. Also, as argued in Sections II and III below, because Butts cannot establish that she was capable of coming to work after October 28, 2010, nor prove a causal link between her employment with PWCS and her service-connected disabilities, she cannot establish a claim for past or future lost wages occurring after that date.

### B. The Wrongful Discharge Claim Should Be Dismissed

Butts contends that she was wrongfully discharged on June 15, 2011, in violation of 38 U.S.C. §4316(c), which provides that:

> *A person who is reemployed by an employer under this chapter shall not be discharged from such employment, except for cause-*
>
> (1) *within one year of such reemployment, if the person's period of service was more than 180 days.*

"Cause in the USERRA context refers to any reason for discharge that is not arbitrary or made in order to avoid the statute's requirement that military service members not be discharged because of their protected military service." *Reed*, 2012 U.S. Dist. LEXIS 72802 at *27 (citing

*Johnson v. Preston Cyles, LLC*, No. 08-0177, 2008 U.S. Dist. LEXIS 92454, at *1 (D.S.C. Nov 13, 2008)).

Setting aside the fact that Butts was not terminated until well over a year after she was reemployed in April of 2009, since she returned to PWCS as a continuing contract teacher, PWCS could only terminate her employment for cause, which, in 2011, was defined by statute to include "incompetency, . . .[which is] construed to include, but shall not be limited to, consistent failure to meet the endorsement requirements for the position or performance that is documented through evaluation to be consistently less than satisfactory." Va. Code §22.1-307.

> **1. Butts Had Notice That Her Continued Failure to Meet Performance Standards Was Cause For Discharge And Was Discharged For Cause Unrelated To Her Military Service.**

PWCS recognizes that USERRA places the burden on an employer in a discharge action to prove that "it was reasonable to discharge the employee for the conduct in question, and that he or she had notice, which was express or can be fairly implied, that the conduct would constitute cause for discharge." 20 C.F.R. §1002.248(a). Where the evidence of the employee's conduct is "overwhelming and largely uncontroverted," summary judgment is appropriate in a discharge claim under 38 U.S.C. §4316(c). *Francis*, 452 F. 3d at 308.

The undisputed facts establish that Butts was well aware of the performance standards for teachers, having been evaluated under similar standards for eight years before she left for military service in 2004. Although the standards became more rigorous during her absence, Butts was provided with training on the new standards and any changes to the evaluation procedures over the summer of 2009.

Despite being repeatedly placed on notice that failure to meet those standards was cause for dismissal, Butts consistently failed, and in many cases refused, to accept the many resources offered by Montclair to address those performance deficiencies, which were directly impacting

the education and wellbeing of her students. Only after Butts refused or failed to meet the objectives of her action plan and was provided another school year in which to do so, was her employment terminated.

> **2. Butts Cannot Rely On The Reemployment Provisions of USERRA To Bootstrap Her Discharge Claim.**

In her Answers to Interrogatories and deposition testimony, Butts identified no facts from which it could be inferred that PWCS' legitimate performance-related reasons for her termination were not valid and were unrelated to her military status or USERRA complaints, other than her subjective belief that her observations and placement on an action plan were "suspicious" and "patently unreasonable," and her contention that during a discussion about Soltis' recommendation for dismissal, Soltis told her, "Dianne, if you resign this will all go away." *See* Ex. 113 at 314-317; Third Amen. Compl. ¶ 92. (However, Butts has conceded that this non-discriminatory remark was made when she "may have" asked Soltis what options were available other than dismissal. Ex. 113 at 345.)

Butts alleges that because PWCS failed to reassign her to another 5th grade position for the 2009-2010 school year and placed her in a 4th grade position "in violation of §§4312 and 4313[,]" her termination was a violation of §4316. *See* Third Amen. Compl. ¶¶138-141. Lacking evidence of discriminatory animus, Butts illogically tries to conflate her reemployment rights under 38 USC § 4312 and 4313 with, what the Fourth Circuit clearly stated in *Francis*, is an entirely separate claim for dismissal under §4316.

Again, the reemployment provision of USERRA:

> only entitles a service person to immediate reemployment and does not prevent the employer from terminating him the next day or even later the same day. . . If §4312 provided ongoing protection after reemployment, it would subsume the specific guarantees of §§4311 and 4316. . . The operative question is whether, based on the undisputed evidence in the record, it was objectively reasonable for [PWCS] to dismiss[Butts].

*Francis*, 452 F. 3d at 304, 308.

The undisputed evidence in this case demonstrates that it was objectively reasonable for PWCS to terminate Butts' employment after she repeatedly failed to meet performance standards, left work in October of 2010, and, according to her own admissions, her doctors, the VA, SSA and VRS, was disabled from working from at least October 28, 2010 through the present. As noted below, an employee who cannot come to work due to a disability is still not a qualified person with a disability under the ADA. For the same reason, an employee who is incapable of working at all cannot logically be "qualified" or be made "qualified" to hold employment under USERRA.

## II.     Summary Judgment Is Appropriate On Count II - The ADA

Butts alleges that in April of 2010, she began suffering from anxiety and elevated blood pressure, and on August 27, 2010 was treated for anxiety, depression, and PTSD allegedly "caused or exacerbated" by her placement on an action plan at Montclair. She further claims that PWCS failed to accommodate her disability by placing her in another job, withdrawing the action plan, or providing her with "time to recuperate" before terminating her employment. Third Amen. Compl. ¶¶ 106-110, 146-149.

Butts has no direct evidence that PWCS failed to accommodate her based on any disability and, therefore, under the *McDonnell Douglas* burden-shifting analysis, must establish a *prima facie* case by showing that: (1) she was a qualified  individual with a disability which substantially limited one or more major life activities; (2) PWCS had notice of her disability; (3) with reasonable accommodation(s) she could perform the essential functions of her position; and (4) PWCS refused to make such accommodation(s). *Rhoads v. Fed. Dep. Ins. Corp.*, 257 F.3d 373, 387, n.11 (4th Cir. 2001).  For purposes of summary judgment, PWCS concedes that Butts suffered from a disability within the meaning of the ADA, but contends that she cannot establish

a *prima facie* case as to the remaining elements of her claim.[2]

    **A.**    **After October 28, 2010, Butts Was Not A Qualified Person With A Disability And Could Not Perform The Essential Functions Of Her Job Because She Could Not Come To Work**

"The ADA defines a 'qualified person with a disability' as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Tyndall v. Nat'l Educ. Ctrs, Inc.*, 31 F. 3d 209, 213 (4th Cir. 1994) (quoting *Southeastern Comm. Coll. v Davis*, 442 U.S. 397, 406 (1979)). "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'" *Id*. This is particularly true in the case of a classroom teacher, who cannot perform her job away from the school, since she must deliver instruction during scheduled class times and must interact with and observe her students. *Id*. A teacher who cannot or will not come to school is not a qualified person with a disability. *Id.*; *Lane v. Prince George's Cnty Pub. Sch.*, No. 11-cv-2088, 2013 U.S. Dist. LEXIS 120653, at *10-*12 (D. MD. Aug. 26, 2013); *Fields v. St. Bernard Parish Sch. Bd*, 11 Am. Disabilities Cas. (BNA) 1845 (E.D. La. 2000) (teacher with PTSD who could not work was not "qualified" under the ADA).

The material facts establish that, commencing on October 28, 2010, Butts could not come to work. She and her physicians repeatedly certified to the VA, SSA and VRS that since then, Butts has been permanently disabled from any type of employment, which is also the major assumption underlying her CPA's opinion that Butts has lost over one million dollars in past and future lost wages. Ex. 115. Plaintiff cannot have it both ways. Since she was not capable of working after that point in time, Butts cannot establish that her disability could have been accommodated by lifting the action plan, moving her to another position, or not terminating her

---

[2] PWCS does not concede that Butts was substantially limited in a major life activity until October 28, 2010 when she was unable to come to work.

employment, nor prove that such requests are reasonable.

### B. PWCS Did Not Have Notice Of Butts' Disability Until October 11, 2010 And Granted Her Only Request For Accommodation

PWCS did not receive notice of any disability and any purported request for accommodation until October 11, 2010, when Soltis received Butts' request for leave to receive treatment for "anxiety, depressed mood and intrusive thoughts of serving in the military." That leave request was granted, with Butts' agreement, to begin on October 28, 2010. Thereafter, Butts remained out of school continuously on paid sick leave and FMLA leave based on repeated certifications that she was unable to return to work, until her employment was terminated in June of 2011. Such an extended leave is a reasonable accommodation, and "'reasonable accommodation does not require the [employer] to wait indefinitely for [Plaintiff's] medical condition to be corrected, especially in light of the uncertainty of cure.'" *Thornton v. Gonzalez*, No. 1:06cv397, 2007 U.S. Dist. LEXIS 98039, at *13 (E.D. Va. Aug. 27, 2007) (granting summary judgment where DEA fired employee with PTSD after his physicians found limited prospects of his ability to ever return to work).

Moreover, Butts never requested that the action plan be lifted or that she be moved to another position **in order to accommodate a disability**. It was not until she belatedly attempted to grieve her proposed dismissal and request to enroll in the Sick Leave Bank, that Butts submitted Raddings' note indicating she had PTSD to support Butts' argument that her condition prevented her from "defending" her grievance. Nor did Butts submit any medical documentation to PWCS reflecting that such an "accommodation" would allow her to perform the essential functions of her job. In contrast, Raddings' note said Butts was permanently disabled and unable to return to work for a minimum of two years. Ex. 81. If Butts could not return to work, such accommodations would be unreasonable and futile.

Finally, Butts alleges that "when PWCS fired Ms. Butts it was failing to accommodate

27

[her] anxiety and depression." [3]  Third Amen. Compl. ¶ 149. Butts was terminated for poor performance, which she repeatedly told the VA was a result of the symptoms of her PTSD. However, the ADA does not prohibit an employer from terminating an employee for conduct arising out of her disability. *Darcangelo v. Verizon Md., Inc*., 189 Fed. Appx. 217, 218 (4th Cir. 2006); *Carrozza v. Howard Co., Md*., 45 F. 3d 425 (4th Cir. 1995) (termination for performance issues and behaviors related to employee's bipolar disorder).

### III. Butts Cannot Prove Damages Attributable to PWCS Under Either Count

Butts alleges under both counts that PWCS caused or exacerbated her "minor psychiatric symptoms," "[t]hat worsening eventually culminated in a diagnosis of full post-traumatic stress disorder, and Ms. Butts was rendered fully disabled and unable to work further by PWCS's actions." Third Amen. Compl. ¶¶ 142, 144, 147-149. Her CPA, Mr. Foote, will testify that she has lost back and front pay since her termination based on the contradictory assumptions that Butts was declared totally disabled by the SSA effective October 28, 2010, but, if not terminated by PWCS in June of 2011, would have worked until retirement age or 2023. Ex.115. However, Butts has repeatedly certified to the VA and the SSA, both that her PTSD **was caused** by her military service, and that her PTSD **_caused_** the performance problems that led to her placement on an action plan and subsequent termination.  Butts has also designated no medical expert to link her PTSD and permanent inability to work to her employment with PWCS.

#### A. Butts Is Estopped From Attributing Her Service-Connected Disabilities to PWCS

While an application for disability benefits does not automatically render an employee

---

[3] Defendant does not read Count II to assert separate wrongful discharge or discrimination claims under the ADA. If the Court disagrees, Defendant contends that Butts still cannot establish that; (1) she was a qualified person with a disability at the time she was terminated since she could not come to work; (2) she met the legitimate expectations of PWCS; or (3) her discharge occurred under circumstances giving rise to a reasonable inference of unlawful discrimination. *Ennis v. Naber*, 53 F. 3d 55, 58 (4th Cir. 1995). Nor can she show that the legitimate reasons for her action plan and termination, *i.e.*, uncorrected performance deficiencies, were a pretext for discrimination. *Id.*

ineligible for relief under the ADA, USERRA or other discrimination statutes, where (as here) there is overwhelming evidence that the employee's sworn attestations in support of disability benefits conflict with critical elements of her claim against her employer, she is estopped from asserting such inconsistent positions and summary judgment is appropriate. *See, e.g.*, *EEOC v. Greater Baltimore Med. Ctr.*, 477 Fed. Appx. 68 (4th Cir. 2012) (holding that employee's explanation for the conflict between his applications for SSDI and his contention that he could return to work did not warrant a finding under the ADA that he could perform the essential functions of his job under the test set forth in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S. Ct. 1597 (1999)); *Detz v. Greiner Indus. Inc*, 346 F. 3d 109, 118 (3d Cir. 2003) (employee cannot defeat summary judgment on ADEA claim "simply by disavowing a prior claim of total disability, perform an "about-face" and assert that he is a qualified individual capable of working); *Berg v. Fairfax Cnty Pub. Sch.*, 105 F. 3d 646 (4th Cir. 1997) (affirming summary judgment where teacher's prior testimony before the Virginia Worker's Compensation Commission and submission of notes and medical certifications conflicted with ADA claim).

Of particular relevance to the case at bar is *Lisdahl v. Mayo Found. for Med. Educ.* Lisdahl sought benefits under FMLA, his employer's long-term disability plan, and the VA, based on repeated representations that he was unable to work because of service-related PTSD, which conflicted with his constructive discharge claim against his employer under USERRA. The Court rejected his USERRA claim for that reason. 698 F. Supp. 2d 1081

### B.    Butts Has No Medical Expert To Establish Causation

Butts has pleaded that PWCS caused or worsened a pre-existing condition, which led to her permanent inability to work. However, she has no medical expert to establish a causal link between her PTSD or other disabling conditions and her employment with PWCS.  It is Butts' burden to produce evidence from which a jury could infer that PWCS' acts and omissions

"probably" -- not possibly -- caused or worsened her disability. *Sakaria v. TWA*, 8 F. 3d 164, 172-74 (4th Cir. 2000). Expert testimony is necessary to establish causation where the nature and cause of a plaintiff's injuries are not within a layman's common knowledge and are determinable only in the light of scientific knowledge. PTSD, a multifactored disorder, is such a condition. *See Jeffree v. Reddy*, 77 Fed. Appx. 627, 632 (4th Cir. 2003) (upholding summary judgment based on district court's exclusion of expert witness, who did not take into account all "stressors" in the plaintiff's life that might have caused or contributed to her mental disorders, including PTSD); *Crinkley v. Holiday Inns, Inc*., 844 F. 2d 156, 164 (4th Cir. 1988) (finding expert testimony sufficient to establish causation between plaintiff's PTSD and assault, and noting "[s]uch expert opinion is of course the prime - - indeed usually the only -- way to prove medical causation"). Since Butts cannot establish a causal link between her PTSD and permanent inability to work and any acts of PWCS, summary judgment should be granted on all claims. *See also, e.g.*, *Nichols vs. Am. Nat'l Ins. Co.*, 154 F. 3d 815, 881 (8th Cir. 1998); *Webb vs. Hyman*, 861 F. Supp. 1094, 1103 (D.D.C. 1994).

## CONCLUSION

Wherefore, Defendant requests entry of an order granting summary judgment on all counts asserted in the Third Amended Complaint.

Respectfully Submitted,

Date: July 6, 2015

 /s/
Mary McGowan, VSB # 22222
Chidi I. James, VSB # 46996
Kristi L. Johnson, VSB # 77776
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, VA 22030
(703) 691-1234 (telephone)
(703) 691-3913(facsimile)
mmcgowan@bklawva.com
cjames@bklawva.com

kjohnson@bklawva.com
*Counsel for Defendant*
*The Prince William County School Board*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed this 6th day of July, 2015 via the Court's Case

Management/Electronic Case Filing (CM/ECF) system, which then delivered a Notice of

Electronic Filing (NEF) to the following:

> Jacob M. Small, Esq.
> J. Madison PLC
> 1750 Tysons Blvd.
> Suite 1500
> McLean, VA 22102
> (703) 910-5062(telephone)
> (703) 910-5107 (facsimile)
> jmsmall@jmadisonplc.com
> *Counsel for Plaintiff*

>     /s/
> Mary McGowan, VSB # 22222
> Chidi I. James, VSB # 46996
> Kristi L. Johnson, VSB # 77776
> BLANKINGSHIP & KEITH, P.C.
> 4020 University Drive, Suite 300
> Fairfax, VA 22030
> (703) 691-1234 (telephone)
> (703) 691-3913(facsimile)
> mmcgowan@bklawva.com
> cjames@bklawva.com
> kjohnson@bklawva.com
> *Counsel for Defendant*
> *The Prince William County School Board*